USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT _________________________ No. 95-1863 UNITED STATES OF AMERICA, Appellee, v. JUAN LABOY-DELGADO, Defendant, Appellant. _________________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO [Hon. Gilberto Gierbolini, Senior U.S. District Judge] __________________________ _________________________ Before Selya and Cummings,* Circuit Judges, ______________ and Coffin, Senior Circuit Judge. ____________________ _________________________ Jose C. Romo Matienzo on brief for appellant. _____________________ John C. Keeney, Acting Assistant Attorney General, Theresa ______________ _______ M.B. Van Vliet and Philip Urofsky, Criminal Division, U.S. Dep't ______________ ______________ of Justice and Guillermo Gil, United States Attorney, on brief _____________ for appellee. _________________________ May 21, 1996 _________________________ __________ *Of the Seventh Circuit, sitting by designation. SELYA, Circuit Judge. On November 3, 1993, a federal SELYA, Circuit Judge. ______________ grand jury empaneled in the District of Puerto Rico indicted defendant-appellant Juan Laboy-Delgado (Laboy) for conspiring to possess cocaine with intent to distribute, 21 U.S.C. 841 & 846, attempting to import cocaine and conspiring to that end, 21 U.S.C. 952, 960, & 963, and aiding and abetting the commission of these crimes, 18 U.S.C. 2. Following Laboy's conviction on all counts and the district court's imposition of a 211-month incarcerative sentence, Laboy prosecuted this appeal. He finds no safe harbor. Determining, as we do, that his assignments of error lack merit, we affirm. I. BACKGROUND I. BACKGROUND We elucidate the facts gleaned at trial in the light most flattering to the jury's verdict. See United States v. ___ ______________ Spinney, 65 F.3d 231, 233 (1st Cir. 1995). We note at the outset _______ that many of the pivotal facts come from testimony of Sonia Figueroa Sanchez (Figueroa), the former wife of a quondam conspirator, Zebedo Maisonet Gonzalez (Maisonet), and from Maisonet himself.1 In early 1990, certain individuals, Maisonet included, hatched a plan to import cocaine from Colombia to Puerto Rico by way of St. Maarten. Maisonet testified that a fellow rogue, Papo Montijo, sponsored the appellant for membership in the cabal.  ____________________ 1Figueroa began cooperating with the authorities during the investigation. Maisonet joined her in a duet as part of a plea agreement negotiated between the date of his arrest and the date of the appellant's trial. 2 Maisonet discussed the venture's prospects with the appellant in the spring of 1990, but forged no enduring alliance. That summer, the wind shifted. Customs officials detained a conspirator attempting to carry cocaine into Puerto Rico on a commercial airline flight, and mechanical difficulties thwarted a seaborne pickup of cocaine in St. Maarten. As the gang pondered new strategies to transport contraband from St. Maarten to Puerto Rico, Montijo again floated the appellant's name. This time the conspirators approached him and, after haggling over the prospective division of spoils, enlisted his services. The appellant arranged for his cousin, Hector Guzman Rivera (Guzman), to ferry a shipment of contraband from St. Maarten to Puerto Rico. He (Laboy) and Maisonet planned to travel by boat to St. Maarten to receive the clandestine cargo preliminary to its transshipment. The planning process proved long on bravado and short on security. Figueroa attended the pivotal meeting at which details of the anticipated trip to and from St. Maarten were reviewed. At the government's behest, she also tape-recorded telephone calls in which she, the appellant, and other coconspirators freely discussed the pending smuggle. Fueled by Figueroa's input, a federal narcotics agent, Victor Ayala, placed Guzman's boat under surveillance on August 9, 1990. At around 11:00 a.m. on August 10, Ayala observed the appellant and a conspirator known only as "Jerry" lugging two heavy suitcases onto the boat. The men stayed aboard for 3 approximately ten minutes and then departed without the suitcases. Late that morning, Guzman and Maria Sostre came aboard carrying a blue rug. Shortly before noon, the appellant reappeared, remained aboard for roughly half an hour, and left carrying a small travel bag. During the afternoon, various persons came and went, some bringing provisions. Near the end of the day the local authorities, fearing that the vessel was being readied for departure, boarded her. They found seventy-three kilograms of cocaine concealed in the ship (under the blue rug that Guzman had brought aboard), and detected traces of cocaine in the now-empty suitcases. The authorities also found four individuals aboard the ship: Edwin Burgos, Fabian Martinez, Maria Sostre, and Miriam Garcia. They arrested Guzman nearby. The appellant had flown to Puerto Rico that day (sometime after delivering the suitcases) and was arrested there. Indictment, trial, conviction, and sentencing followed apace. This appeal ensued. II. SUFFICIENCY OF THE EVIDENCE II. SUFFICIENCY OF THE EVIDENCE The appellant challenges the sufficiency of the proof adduced against him at trial, insisting that the district court should have granted his timely motion for judgment of acquittal. See Fed. R. Crim. P. 29(a). The standard of appellate review is ___ familiar: like the trial court, the court of appeals must determine whether the evidence proffered, arrayed in the light most favorable to the prosecution, enabled a rational jury to find each element of the offense beyond a reasonable doubt. See ___ 4 United States v. Valle, 72 F.3d 210, 217 (1st Cir. 1995); United _____________ _____ ______ States v. Olbres, 61 F.3d 967, 970 (1st Cir.), cert. denied, 116 ______ ______ _____ ______ S. Ct. 522 (1995). In so doing, we must draw all reasonable evidentiary inferences in harmony with the verdict, see United ___ ______ States v. O'Brien, 14 F.3d 703, 706 (1st Cir. 1994), and resolve ______ _______ all disagreement regarding the credibility of witnesses to the government's behoof, see United States v. Taylor, 54 F.3d 967, ___ _____________ ______ 974 (1st Cir. 1995). As long as the totality of the evidence presented, viewed through this glass, supports the jury's verdict, it is legally irrelevant that a different jury, drawing alternative inferences, might have reached a different result. See United States v. Gifford, 17 F.3d 462, 467 (1st Cir. 1994). ___ _____________ _______ The appellant tries to place his insufficiency challenge into bold relief by emphasizing three points. None has force. 1. The appellant says that the government's case 1. falters because the evidence at trial did not precisely define his "specific role in the criminal enterprise." To be sure, that sort of definition is helpful in setting sentencing ranges, see, ___ e.g., U.S.S.G. 3B1.1, 3B1.2, but to prove a defendant guilty of ____ a narcotics-related conspiracy the government need not specify and prove with particularity the defendant's exact role in the scheme. See, e.g., United States v. Carroll, 871 F.2d 689, 692- ___ ____ _____________ _______ 93 (7th Cir. 1989). Put another way, the government need not prove facts beyond those that are necessary to establish the elements of the crimes charged, see United States v. Staula, 80 ___ _____________ ______ 5 F.3d 596, 605 (1st Cir. 1996), and neither the elements of a drug-conspiracy charge under 21 U.S.C. 846 nor an importation charge under 21 U.S.C. 952 include a definitive specification of the defendant's role in the offense.2 See, e.g., United ___ ____ ______ States v. Sepulveda, 15 F.3d 1161, 1173 (1st Cir. 1993) ______ _________ (discussing elements of offense under 846), cert. denied, 114 _____ ______ S. Ct. 2714 (1994); United States v. Nueva, 979 F.2d 880, 884 _____________ _____ (1st Cir. 1992) (discussing elements of offense under 952), cert. denied, 507 U.S. 997 (1993). _____ ______ 2. The appellant next decries the fact that much of 2. the evidence against him came from a cooperating codefendant (Maisonet). The appellant suggests that Maisonet was presumptively untrustworthy because of his strong motivation to say what the government wanted to hear. This sort of suggestion can be molded into a powerful jury argument but it has little potency on appeal. The persons most knowledgeable about the inner workings of criminal enterprises tend to be the criminals themselves. Thus, the government which has no choice but to take its witnesses as it finds them often must rely on blackguards and knaves, whose testimony is admittedly tinged with self-interest, to prove its allegations. Such flaws do not render the testimony inadmissible it would be a surreal system of justice if only  ____________________ 2To the extent that the appellant claims the prosecution misfired by failing to show that he possessed some special skill needed by the conspirators, he has again strayed beyond the elements of the offense. His claim is, therefore, unavailing. 6 those who were without sin could offer evidence in a criminal case but a witness' involvement in the crime and his motive for turning on his erstwhile accomplices are fair game for defense counsel. The rules thus permit the witness' credibility to be tested in the crucible of cross-examination. In this instance the appellant vigorously attacked Maisonet's motives at trial, and the resultant credibility choice was for the jury, not for this court.3 See, e.g., O'Brien, 14 F.3d at 706. ___ ____ _______ 3. Relatedly, the appellant bewails certain 3. contradictions in Maisonet's testimony, concluding that these contradictions rendered his testimony inherently unreliable. The asserted contradictions are mostly of peripheral interest; for example, Maisonet at one point suggested that the appellant invited Guzman to join the conspiracy, yet mentioned, on other occasions, that the conspirators had retained Guzman's services before the appellant hove into view.4 Court cases, however, are  ____________________ 3We note that the trial judge drew the jury's attention to the potential problems with testimony of this type, instructing the jurors, inter alia, that the testimony of informants and _____ ____ accomplices cooperating with the government "must be examined and weighed by [you] with greater care and caution than the testimony of ordinary witnesses." 4We say "asserted contradictions" because, for example, the jury could have found the supposed contradiction concerning who first hired Guzman to be more apparent than real. The testimony revealed that, during Guzman's earlier trip, he worked for a few low-level conspirators and had little contact with Maisonet or his principal partner. When Maisonet and the appellant thereafter discussed ways of transporting the cocaine, the appellant referred to Guzman only as his cousin, and not by name. Thus, Maisonet could have "hired" Guzman through Laboy in a very real sense, notwithstanding Guzman's earlier brush with the enterprise. 7 not choreographed with the precision of a ballet. Some degree of contradiction is commonplace and, for the most part, the judicial system relies upon devices such as the cross-examiner's vigor, the jurors' common sense, and the trial judge's practiced intuition to separate grain from chaff. Those checks and balances were fully in play here and, on this scumbled record, we think that the jury could reasonably have believed Maisonet's testimony despite the asserted contradictions. See, e.g., United ___ ____ ______ States v. Romero, 32 F.3d 641, 646 (1st Cir. 1994) (explaining ______ ______ that the court of appeals "will not secondguess the jury's decision to credit testimony which contains an inconsistency"); see also United States v. Johnson, 55 F.3d 976, 979 (4th Cir. ___ ____ _____________ _______ 1995); United States v. Jackson, 959 F.2d 81, 82-83 (8th Cir.), _____________ _______ cert. denied, 506 U.S. 852 (1992). _____ ______ We add an eschatocol of sorts. Rejecting the appellant's insufficiency challenge comes more readily in this case because the evidence against him went far beyond the fingerpointing of a turncoat. Figueroa's testimony was little short of damning, and, moreover, the jury heard the tape-recorded conversations in which the appellant and others spelled out aspects of the scheme. Appellant himself made inculpatory statements when arrested. Then, too, Agent Ayala observed the appellant delivering suitcases later found to have contained cocaine. In similar situations, where the government offered circumstantial evidence of defendants' participation in drug crimes, combined with trace elements of drugs found in objects 8 carried by those defendants, our sister circuits have had little difficulty in sustaining convictions against insufficiency challenges. See, e.g., United States v. Rodriguez, 993 F.2d ___ ____ _____________ _________ 1170, 1175-76 (5th Cir. 1993), cert. denied, 114 S. Ct. 1547 _____ ______ (1994); United States v. Arango, 853 F.2d 818, 826 (11th Cir. _____________ ______ 1988). So it is here. III. LIMITATION OF CROSS-EXAMINATION III. LIMITATION OF CROSS-EXAMINATION The appellant complains that the district court erred in circumscribing his cross-examination of a government witness. Under the Confrontation Clause, every criminal defendant has a right "to be confronted with the witnesses against him." U.S. Const. amend. VI. This protection "means more than being allowed to confront the witness physically." Davis v. Alaska, 415 U.S. _____ ______ 308, 315 (1974). Rather, its primary purpose is to ensure that a defendant has a fair opportunity to cross-examine witnesses. See ___ Delaware v. Van Arsdall, 475 U.S. 673, 678 (1986); United States ________ ___________ _____________ v. Boylan, 898 F.2d 230, 254 (1st Cir.), cert. denied, 498 U.S. ______ _____ ______ 449 (1990). In defining the scope of this guarantee, the Court has "recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." Davis, _____ 415 U.S. at 316-17. While the right to test witnesses by cross-examination is fundamental, it is not unbridled. See, e.g., Boylan, 898 F.2d ___ ____ ______ at 254; United States v. Chaudhry, 850 F.2d 851, 856 (1st Cir. _____________ ________ 1988); see also Delaware v. Fensterer, 474 U.S. 15, 20 (1984) ___ ____ ________ _________ 9 (per curiam) (explaining that "[t]he Confrontation Clause guarantees an opportunity for effective cross-examination, not ___________ cross-examination that is effective in whatever way, and to whatever extent, the defense might wish") (emphasis in original). When a witness' credibility is in issue, the trial court may impose limits on cross-examination as long as the court grants the defendant sufficient leeway to establish "a reasonably complete picture of the witness' veracity, bias, and motivation." Boylan, 898 F.2d at 254. If the trial court imposes such ______ limitations and the defendant thereafter challenges them on appeal, we review the record de novo to ascertain whether the court, overall, gave the defendant a reasonable chance to develop the whole picture. See United States v. Nelson, 39 F.3d 705, 708 ___ _____________ ______ (7th Cir. 1994). If we find that the core concerns of the Sixth Amendment have been satisfied, we "will grant relief from the shackling of cross-examination only for manifest abuse of discretion." Boylan, 898 F.2d at 254. ______ In this case, the appellant cites two specific instances in which the trial court cut off cross-examination, and avers that these rulings are insupportable. We examine each instance. 1. In the first iteration, the district judge directed 1. defense counsel to pursue new avenues of examination after counsel queried Maisonet as to the chronology of events in St. Maarten on the day the drugs were seized. But this was not a pathbreaking expedition; counsel had thrice previously led 10 Maisonet down the same road and Maisonet had consistently answered that he returned to Puerto Rico that morning but that he could not remember the precise time. Cross-examiners should be given reasonable latitude, especially in criminal cases, but they are not at liberty endlessly to repastinate the same terrain (whether or not they are satisfied with the answers elicited from a particular witness). In this instance we discern no prejudice in the district court's refusal to let counsel go to the well for what would have amounted to a fourth time, and, accordingly, we detect no hint of either constitutional error or abuse of discretion. See, e.g., Boylan, 898 F.2d at 254-55; Chaudhry, 850 ___ ____ ______ ________ F.2d at 856. 2. In the second iteration, the district court 2. prevented defense counsel from questioning Maisonet in detail regarding the terms and conditions of his plea agreement with the government. The appellant protests that this limitation prevented his counsel from fully impeaching Maisonet's veracity. The record belies the appellant's protest. Defense counsel thoroughly examined Maisonet anent the charges brought against him and the benefits that he expected to derive from his plea agreement. Most importantly, the court admitted the agreement itself into evidence, and defense counsel made profitable use of it. No more was exigible. See United States ___ _____________ v. Ovalle-Marquez, 36 F.3d 212, 219 (1st Cir. 1994) (holding ______________ that, where cross examination informed the jury of the benefit a witness garnered from a plea agreement, the district court could 11 properly limit further cross-examination on the subject), cert. _____ denied, 115 S. Ct. 947 (1995); United States v. Maceo, 947 F.2d ______ ______________ _____ 1191, 1200 (5th Cir. 1991) (similar), cert. denied, 503 U.S. 949 _____ ______ (1992); United States v. Twomey, 806 F.2d 1136, 1139-40 (1st Cir. _____________ ______ 1986) (similar). IV. PROSECUTORIAL MISCONDUCT IV. PROSECUTORIAL MISCONDUCT The appellant calumnizes several statements made during the government's closing argument. He maintains that these improper statements tainted his trial and, concomitantly, that the lower court improvidently denied his motions for mistrial. In regard to the first two statements attacked by the appellant, we conduct our review of the trial court's rulings de novo and will set aside the verdict only if we find that "the prosecutor's remarks were both inappropriate and harmful." United States v. Wihbey, 75 F.3d 761, 771 (1st Cir. 1996); accord _____________ ______ ______ United States v. Levy-Cordero, 67 F.3d 1002, 1008 (1st Cir. ______________ ____________ 1995), cert. denied, 64 U.S.L.W. 3708 (U.S. Apr. 22, 1996) (No. _____ ______ 95-8398). Challenged statements are considered harmful when, evaluated in the totality of the circumstances, they would probably have affected the outcome of the trial. See Wihbey, 75 ___ ______ F.3d at 771. In assessing harm, courts frequently look to such factors as the severity of the purported misconduct, the weight of the evidence supporting the verdict, the presence and likely effect of a curative instruction, and the prosecutor's purpose in making the statement (i.e.: whether the statement was willful or inadvertent). See id. at 772; Sepulveda, 15 F.3d at 1187-88; ___ ___ _________ 12 United States v. Mejia-Lozano, 829 F.2d 268, 274 (1st Cir. 1987). _____________ ____________ Above all, courts must refrain from examining challenged statements in a vacuum, but, rather, must look to context for assistance in determining both their meaning and their effect. See Sepulveda, 15 F.3d at 1187. ___ _________ 1. The appellant's first complaint is with the 1. prosecutor's statement that "in the case at bar, there is no doubt and I believe my Brother Counsel would agree that a conspiracy existed." When the statement was made, the appellant objected and the district court interrupted the prosecutor's summation with an admonition to the jury that "[t]he objection was sustained so the statement is stricken and should not be taken in consideration by you." We have consistently held that an immediate curative instruction dilutes (and usually fully dissipates) the potential prejudice from an improper statement. See, e.g., United States v. Rivera-Gomez, 67 F.3d 993, 998 (1st ___ ____ _____________ ____________ Cir. 1995); Sepulveda, 15 F.3d at 1185. _________ Viewing this statement in context, see Sepulveda, 15 ___ _________ F.3d at 1187, we see no reason why the usual praxis should not apply. The appellant's theory of the case, as expressed in his opening statement, was that he was "not part of [the] criminal organization." By like token, defense counsel acknowledged the conspiracy and referred to it in summation as an "orchestra," conducted by Maisonet and others, in which appellant did not even play second fiddle. Given the appellant's stated theory of the case, the prosecutor's remark cannot easily be labelled as either 13 "inappropriate" or "harmful." And, moreover, the lower court cured any reasonable possibility of prejudice when it sustained the appellant's contemporaneous objection and instructed the jury to ignore the offending statement. See, e.g., id. at 1185. ___ ____ ___ 2. At trial, Figueroa stated that she left Puerto Rico 2. for Milwaukee "because [she] found out that on August 10th the crew and the boat had been arrested in St. Maarten." In summation, the prosecutor put a twist on this testimony, suggesting that Figueroa, after betraying the conspiracy by giving information to Agent Ayala, fled to Milwaukee "to protect herself." The appellant objected, arguing that the statement implied that Figueroa feared that those conspirators still at large (or their cohorts) might attempt to do her harm. The trial court sustained the objection and cautioned the jury that the "statement is stricken and you should not take it in consideration for anything in this case." The court simultaneously denied the appellant's motion for a mistrial. Viewed in light of the copious evidence of guilt that permeates the record, we cannot say that this remark warrants reversal. Though the prosecutor's statement was untoward, its impact could not have been great. The phrase "to protect herself" is inherently ambiguous, and there was no intimation that the witness feared that the defendant might try to injure her.5 We think that, on balance, the objectionable phrase  ____________________ 5On appeal, Laboy attempts to link the prosecutor's comment with Maisonet's testimony that he was attacked at one point because he was suspected of being an informant. There is no 14 represents no more than an isolated comment, unlikely to smear the appellant with facts not in evidence, and that the judge's curative instruction sufficed to quell any prejudice. We therefore reject the appellant's plaint that the wayward comment requires us to set aside his conviction. On the same basis, we likewise reject his plaint that the district court erred in failing to grant his motion for a mistrial. See United States v. ___ _____________ Pierro, 32 F.3d 611, 617 (1st Cir. 1994) (explaining that "it is ______ only rarely and in extremely compelling circumstances  that an appellate panel, informed by a cold record, will venture to reverse a trial judge's on-the-spot decision that the interests of justice do not require aborting an ongoing trial"), cert. denied, 115 S. Ct. 919 (1995). _____ ______ 3. The appellant also criticizes the prosecutor's 3. underscoring of the paucity of evidence supporting the appellant's theory of the case. He objects particularly to the prosecutor pointing out that his character witnesses were not present in St. Maarten on the day of the denouement, and inviting the production of a percipient witness who could offer an alternative explanation of the events of August 10. The appellant's point is that the prosecutor impermissibly drew attention to the appellant's silence.6 See United States v. ___ ______________  ____________________ basis either in the record or in the prosecutor's summation for forging such a link. 6We quote below the criticized remarks in their entirety: "He told you also about the two reputation witnesses and that I asked him an 15 Lilly, 983 F.2d 300, 306-07 (1st Cir. 1992) (reaffirming that the _____ Fifth Amendment prohibits a prosecutor, directly or indirectly, from asking the jury to draw a negative inference from a defendant's silence).  These statements did not transgress the appellant's Fifth Amendment rights.7 When a defendant suggests that a prosecutor adverted to his silence, we must examine the challenged statement in context. See id. at 307. The key to our ___ ___ inquiry is "whether, in the circumstances of the particular case, the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." Id. ___ (citations omitted). We will not "lightly infer that a prosecutor intends an ambiguous remark to have its most damaging  ____________________ unfair question. Those aren't unfair questions. I asked him, "Were you there. He wasn't there so he can't tell us anything. You see, the issue is what happened that day and they are bringing witnesses to tell you about other things. Well, bring me a witness to tell me what happened there. What is a reputation witness going to say, He is a good friend. The person that says he was like my brother and that man that came here is a very good man and so is the other one but see, he didn't know what Juan Laboy Delgado was doing in August of 1990 in St. Maarten because he was not there so he can't testify as to that." 7In undertaking this analysis we assume arguendo, but do not ________ decide, that the appellant lodged a timely objection to this line of argument. In point of fact, no contemporaneous objection was raised. However, the appellant advanced an objection to this line of argument at the end of the prosecutor's rebuttal and simultaneously moved for a mistrial. 16 meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." Donnelly v. DeChristoforo, 416 U.S. 637, 647 ________ _____________ (1974). Applying these principles, we are satisfied that the comments did not cross the line. The fairest characterization of the prosecutor's argument indeed, the only plausible characterization is as an attempt to accentuate the general lack of testimony supporting the appellant's position. No fewer than six individuals, not including the appellant, were on the vessel on August 10, so the prosecutor's allusion logically and naturally referred to this cadre of individuals, not to the appellant himself. See, e.g., Sepulveda, 15 F.3d at 1187; United ___ ____ _________ ______ States v. Collatos, 798 F.2d 18, 20 (1st Cir.), cert. denied, 479 ______ ________ _____ ______ U.S. 993 (1986). And in all events, the district court's forceful instructions regarding the appellant's right not to testify resolved any conceivable ambiguity.8 V. USE OF SELF-INCRIMINATING STATEMENTS V. USE OF SELF-INCRIMINATING STATEMENTS The appellant complains that he was not adequately advised of his rights when arrested, and that the court below should have prohibited the government from introducing the statements that he made into evidence. This argument need not detain us. The appellant neither moved to suppress the  ____________________ 8Since we find that the prosecutor's statement did not prejudicially highlight the appellant's failure to testify, we find no abuse of discretion in the district judge's denial of the concomitant motion for a mistrial. See Pierro, 32 F.3d at 617; ___ ______ Sepulveda, 15 F.3d at 1185. _________ 17 statements nor objected to their introduction at trial. At best, then, the standard of review is for plain error. See United ___ ______ States v. Olano, 507 U.S. 725, 730 (1993). The plain error ______ _____ hurdle is high: the appellant must show (1) an error, id. at ___ 732, that (2) is "obvious" or "clear under current law," id. at ___ 734, and that (3) "affect[ed] substantial rights." Fed. R. Crim. P. 52(b).9 In this instance there was no error, plain or otherwise. Agent Ayala testified without contradiction that both he and his deputy advised the appellant of his rights before they initiated any interrogation. Thus, the court below had a solid foundation on which to rest the admission of the disputed evidence. VI. CONCLUSION VI. CONCLUSION We need go no further. From aught that appears, the appellant was fairly tried and justly convicted. Consequently, the judgment of the district court must be  Affirmed. Affirmed. ________  ____________________ 9Even if these elements are present, the court of appeals retains discretion to decide whether to take notice of a plain error. See Olano, 507 U.S. at 736. We are inclined to exercise ___ _____ that discretion sparingly, generally limiting it to instances in which the error, if uncorrected, would result in a miscarriage of justice or, put another way, would "skew[] the fundamental fairness or basic integrity of the proceeding below in some major respect." Taylor, 54 F.3d at 973. ______ 18