USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 96-1372 UNITED STATES, Appellee, v. JACK CIOCCA, Defendant - Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE [Hon. Gene Carter, U.S. District Judge] ___________________ ____________________ Before Torruella, Chief Judge, ___________ Coffin and Campbell, Senior Circuit Judges. _____________________ _____________________ John C. McBride, with whom McBride & Keefe was on brief for _______________ ________________ appellant. F. Mark Terison, Assistant United States Attorney, with whom _______________ Jay P. McCloskey, United States Attorney, and Jonathan R. __________________ ____________ Chapman, Assistant United States Attorney, were on brief for _______ appellee. ____________________ February 24, 1997 ____________________ TORRUELLA, Chief Judge. On June 8, 1995, a complaint TORRUELLA, Chief Judge. ____________ was filed against Defendant-Appellant Jack Ciocca ("Ciocca") and Harold Nelson ("Nelson"), who is not a party to this appeal, charging both with conspiracy to distribute, and to possess with intent to distribute, cocaine in violation of 18 U.S.C. 846, and distribution and possession with intent to distribute in violation of 18 U.S.C. 841(a)(1) and (b)(1)(A). After a jury found Ciocca guilty on both counts, the district court sentenced him to imprisonment for a term of 188 months, supervised release for a term of eight years, and a fine of $70,000. Ciocca now appeals his conviction on three grounds. He claims that (1) the district court erred in refusing to admit the psychiatric records of prosecution witness Kevin Caporino ("Caporino"); (2) the evidence was insufficient to support a conspiracy conviction; and (3) the district court erred in admitting tapes of conversations involving Ciocca and Caporino. BACKGROUND BACKGROUND We present the facts the jury reasonably could have found, in the light most favorable to the verdict. United States _____________ v. Josleyn, 99 F.3d 1182, 1185 n.1 (1st Cir. 1996). Kevin _______ Caporino met Ciocca in 1981 when Ciocca entered the Maine restaurant in which Caporino was working. At that first meeting, Caporino gave Ciocca some cocaine for personal use. Ciocca later stopped back at the restaurant and told Caporino that he was involved in a cocaine trafficking business. Within a month of that initial meeting, Caporino then met Ciocca in Connecticut. -2- At the Connecticut meeting, Ciocca gave Caporino an eighth of a kilogram of cocaine, which Caporino tried to sell in Maine. Caporino continued to sell cocaine for Ciocca until 1983, when Caporino was involved in an automobile accident. This accident caused Caporino to suffer amnesia and led to extensive therapy intended to recover his memory. In the spring of 1994, Ciocca and Nelson contacted Caporino and requested that he serve as a courier between Ciocca in Connecticut and Nelson in Maine. Caporino agreed. During the 1980s, Caporino had served Ciocca in a similar capacity, transporting cocaine between Connecticut and Maine up to ten times. Caporino's role was to retrieve money from Nelson, drive the money to Ciocca in Connecticut, wait for Ciocca to count the money, then transport a kilogram of cocaine from Ciocca's residence back to Nelson. For his role, Caporino was paid $2,000 by Nelson for each delivery, although sometimes he was paid a pound of marijuana in lieu of the $2,000. Caporino made six such trips prior to his arrest in May 1995. In late April or early May 1995, Caporino received a kilogram of cocaine from Ciocca and delivered it to Nelson. At this point, Nelson gave him an ounce of cocaine for repayment of money owed to Caporino. Caporino in turn gave this ounce to undercover Agent Scott Durst, of the Maine Drug Enforcement Agency. Upon this transaction, Caporino was arrested and agreed to cooperate with law enforcement personnel. On May 11, Caporino was paid $250 for further debts owed him by Nelson. -3- On May 3, 1995, Ciocca participated in a controlled buy with Agent Durst, using Caporino as a conduit for the transactions. The buy was arranged by means of several electronically monitored telephone conversations between Ciocca and Caporino, during which Ciocca told Caporino that he would bring three and a half ounces of cocaine to a meeting place in Boston. Prior to the controlled buy, Caporino was searched by agents of the U.S. Drug Enforcement Agency. The buy was monitored by means of an electronic wire and a micro-tape recorder placed on Caporino. Caporino, accompanied by Durst, met Ciocca outside the Boston Gardens. Ciocca and Caporino entered a nearby restaurant and proceeded to the restroom. Caporino and Ciocca were in the restroom for three to four minutes, during which time Caporino gave Ciocca $3,000, which he had received from Durst and which Ciocca counted out in the restroom. In exchange, Ciocca gave Caporino three and a half ounces of cocaine. After the buy, Caporino gave the cocaine to Agent Durst. Caporino and Durst then returned to a nearby DEA office, where Caporino was searched again. Between May 11 and June 7, Caporino engaged in telephone and in-person conversations with Ciocca and Nelson, trying to determine when the next delivery between the two would occur. On June 7, Nelson informed Caporino that he had the money for the buy and had spoken with Ciocca, who had a kilogram of cocaine ready for purchase. That day, Nelson met with Caporino in Maine and transferred to him an envelope containing $5,500. -4- The two made arrangements for the transfer of the cocaine to Nelson upon Caporino's return from Connecticut. Both prior to and after this meeting, Caporino and his car were searched. Caporino then travelled with Agent Durst to Connecticut to pick up the kilogram of cocaine from Ciocca. Caporino's car broke down along the way and the DEA supplied a truck to complete the trip. Approximately ten minutes away from Ciocca's house, the agents transferred Caporino to the truck. At the time of this transfer, Caporino was searched. Agent Durst accompanied Caporino in the truck until they were near Ciocca's home, at which point Durst joined the other law enforcement agents. After being ushered into the house by Ciocca, Caporino waited while Ciocca finished cooking with his daughter. Thereafter, Ciocca and Caporino went to the master bathroom and closed the door. Ciocca put on thin black gloves and began to count the money Caporino had brought from Nelson. Ciocca retrieved a kilogram of cocaine from a closet in the bathroom and gave it to Caporino. The two proceeded down the stairs to the cellar, from which Caporino left the house. During this time, law enforcement agents were stationed on the street near Ciocca's mailbox, monitoring the wire transmissions from inside the house. Upon meeting up with the drug enforcement agents in a nearby parking lot, Caporino turned over to the agents a brown paper bag containing a rectangular package of cocaine. Both Caporino and the truck were again searched. -5- During the early morning of June 8, Nelson paged Caporino to transfer the cocaine. The two arranged to meet at a restaurant in Portland, Maine. From there, the two went to a commuter parking lot, where Caporino claimed his car had broken down. Nelson retrieved the kilogram of cocaine from the trunk of Caporino's car, after which drug enforcement agents arrested him. Later that day, a search warrant executed at Ciocca's home turned up several firearms, including one located in the master bathroom closet and three firearms in an attache case in the bottom of that closet. Finally, another firearm was located in a bureau in the master bedroom. The agents also seized the $5,500 that Nelson had transferred to Caporino the previous day from the medicine cabinet of Ciocca's master bathroom. DISCUSSION DISCUSSION I. Denial of defendant's request for Caporino's I. Denial of defendant's request for Caporino's medical and psychiatric records medical and psychiatric records Ciocca first argues that the district court erred when it denied his request for discovery of, and failed to admit into evidence, Caporino's medical and psychiatric records related to his 1983 accident. Ciocca contends that the records are exculpatory evidence to which he is entitled under Brady v. _____ Maryland, 373 U.S. 83 (1963). Such evidence is discoverable by ________ the defendant where it "is material either to guilt or to punishment." Brady, 373 U.S. at 87. _____ In order to succeed on a Brady claim, "a defendant must _____ show that the withheld 'evidence was exculpatory, as measured by its materiality.'" United States v. Watson, 76 F.3d 4, 7 (1st _____________ ______ -6- Cir.) (quoting United States v. Hemmer, 729 F.2d 10, 14 (1st ______________ ______ Cir.), cert. denied, 467 U.S. 1218 (1984)), cert. denied, ___ _____________ _____________ U.S. ___, 116 S. Ct. 1889 (1996). "Information is 'material' 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" United States v. Blais, 98 F.3d 647, 651 (1st _____________ _____ Cir. 1996) (quoting United States v. Bagley, 473 U.S. 667 ______________ ______ (1985)). "Where, as here, the defendant has made a pretrial request for specific exculpatory information, reversal is required if nondisclosure 'might have affected the outcome of the trial.'" United States v. Devin, 918 F.2d 280, 289 (1st Cir. ______________ _____ 1990). After carefully reviewing each of the sealed records, we find that non-disclosure could not have affected the outcome of the trial. Disclosure of these medical records, in light of defense counsel's unhindered cross-examination of several government witnesses on this issue, could not have altered either the jury's conviction or the sentencing court's disposition and is therefore not material. Nothing in the records could have bolstered defense counsel's cross-examination of Caporino. We thus find no error in the district court's denial of Ciocca's motion for access to Caporino's psychiatric records. Ciocca emphasizes that the district court's denial of his disclosure request prejudiced his ability to impeach Caporino on cross-examination, and thus violated his right to confrontation guaranteed by the Sixth Amendment. "The Sixth -7- Amendment guarantees criminal defendants an adequate opportunity to cross-examine adverse witnesses." United States v. Butt, 955 _____________ ____ F.2d 77, 86 (1st Cir. 1992). While a witness's psychiatric records may sometimes be an appropriate subject for cross- examination, the right to cross-examination is not absolute. Id. ___ "Once the defendant has been afforded a reasonable opportunity to question a witness' veracity and motivation, the trial judge enjoys broad discretion in determining the scope and extent of cross-examination." Id. (internal quotations omitted). ___ As Caporino was the government's primary witness, we do not doubt that challenging Caporino's credibility was crucial to Ciocca's defense. We find, however, that Ciocca's ability to impeach Caporino did not suffer because of, and that Ciocca was not prejudiced by, the district court's denial of access to these records. Defense counsel engaged in a thorough and probing cross-examination of Caporino, as well as of Agent Durst of the Maine Drug Enforcement Agency and Agent John Bryfonski of the U.S. Drug Enforcement Agency, regarding the extent of Caporino's memory loss after his accident. Ciocca brought out Caporino's statements that he was a "walking zombie," that he had to "reconstruct his brain" after the accident, that just after the accident, and perhaps for years thereafter, Caporino could not remember anything that occurred prior to the accident, that Caporino was hospitalized for amnesia after the accident, that he "forgot my whole life," that Caporino had to "build a new brain," and that Caporino's brain had "gone the wrong way." The above -8- testimony demonstrates that Ciocca was able to place before the jury ample evidence regarding Caporino's ability to remember the events that transpired prior to and after his accident. That the jury chose to credit Caporino's testimony, even after Ciocca's thorough cross-examination, is within its province as factfinder. United States v. DiSanto, 86 F.3d 1238, 1246 (1st Cir. 1996). On _____________ _______ review, we defer to all jury determinations of credibility. See ___ United States v. Smith, 101 F.3d 202, 215 (1st Cir. 1996). _____________ _____ Thus, having found that the sealed records were not material to Ciocca's guilt or punishment and that Ciocca was not prejudiced by this lack of access to the sealed records, we conclude that the district court properly denied access to the records as Brady material. _____ II. Sufficiency of the evidence II. Sufficiency of the evidence Ciocca next claims that the district court erred in denying his motion for judgment of acquittal. He contends that no credible evidence established a conspiracy from the spring of 1994 to May 1995.1 He argues that there was no evidence, outside that provided by Caporino, linking him to a conspiracy with Nelson prior to May 1995. He acknowledges that there were conversations between Caporino and Nelson and between Caporino and Ciocca, but nothing linking the three in a conspiracy. Ciocca is, in essence, challenging the sufficiency of the evidence.  ____________________ 1 He appears to concede that the evidence was sufficient to establish a conspiracy during the time following Caporino's decision to cooperate with the government. -9- In assessing a challenge to the sufficiency of the evidence, we "review the record to determine whether the evidence and reasonable inferences therefrom, taken as a whole and in the light most favorable to the prosecution, would allow a rational jury to determine beyond a reasonable doubt that the defendants were guilty as charged." United States v. Sullivan, 85 F.3d 743, 747 (1st Cir. 1996) ______________ ________ (quoting United States v. Mena-Robles, 4 F.3d 1026, 1031 (1st ______________ ___________ Cir. 1993), cert. denied, ___ U.S. ___, 114 S. Ct. 1550 (1994)). ____________ "To uphold a conviction, the court need not believe that no verdict other than a guilty verdict could sensibly be reached, but must only satisfy itself that the guilty verdict finds support in 'a plausible rendition of the record.'" United States _____________ v. Echeverri, 982 F.2d 675, 677 (1st Cir. 1993) (quoting United _________ ______ States v. Ortiz, 966 F.2d 707, 711 (1st Cir. 1992), cert. denied, ______ _____ ____________ 506 U.S. 1063 (1993)). In order to prove conspiracy, the government was required to prove beyond a reasonable doubt that Ciocca "entered an agreement to commit the substantive offense, and that [he] was a voluntary participant in the conspiracy." United States v. ______________ And jar, 49 F.3d 16, 20 (1st Cir. 1995). In addition, the _______ government must prove both an intent to agree and an intent to commit the substantive offense. Id. In considering the ___ evidence, "a 'common purpose and plan may be inferred from a development and collocation of circumstance.'" Id. at 21 ___ (quoting United States v. S nchez, 917 F.2d 607, 610 (1st Cir. _____________ _______ 1990) (citations and internal quotations omitted), cert. denied, ____________ 499 U.S. 977 (1991)). -10- In the Background section, supra, we recited the __________ _____ evidence in the light most favorable to the jury verdict. That evidence indicates that, in the spring of 1994, Ciocca initiated an understanding with Caporino that Caporino would serve as courier in a drug trade between Ciocca in Connecticut and Nelson in Maine. The jury could have found that Caporino engaged in at least six transactions prior to May 1995 During each transaction, Nelson contacted Caporino to let him know that the money was ready to be transported to Ciocca. After Caporino retrieved the money from Nelson, he drove it to Ciocca's house in Connecticut, where Ciocca counted it. Ciocca would then turn over a kilogram of cocaine to Caporino, who would transport the kilogram of cocaine back to Nelson in Maine. We believe that the jury could infer from the evidence as a whole that Nelson and Ciocca entered into an agreement in the spring of 1994 to transport cocaine between Connecticut and Maine, that they had an intent to agree and an intent to distribute cocaine, and that the agreement continued up to and including the point at which Ciocca was arrested. See, e.g., And jar, 49 F.3d at 21 (noting that an ___ ____ _______ appellate court draws all credibility determinations in favor of the verdict, even in instances where the conviction relies solely on the uncorroborated testimony of a confidential informant, "so long as the testimony is not incredible or insubstantial on its face" (internal quotations omitted)); United States v. Cresta, ______________ ______ 825 F.2d 538, 546 (1st Cir. 1987) (recognizing that there is no federal requirement of corroboration of an informant's testimony -11- provided the testimony is not "incredible or insubstantial on its face" (internal quotations omitted)), cert. denied, 486 U.S. 1042 ____________ (1988); United States v. Davis, 623 F.2d 188, 195 (1st Cir. 1980) _____________ _____ (finding it "clear that a [conspiracy] conviction can rest on the uncorroborated testimony of a co-defendant or accomplice" (internal quotations omitted)). Because Caporino's testimony is far from being incredible or insubstantial on its face, we find no error in the district court's denial of Ciocca's motion for judgment of acquittal. III. Admission of the taped conversations between III. Admission of the taped conversations between Ciocca and Caporino Ciocca and Caporino During the trial, the government sought to introduce into evidence approximately 27 audiotape recordings procured through consensual recording. The audiotapes contained conversations between Caporino and Ciocca and between Caporino and Ciocca's co-conspirator Nelson. The district court conditionally admitted the audiotapes, subject to a later ruling under United States v. Petrozziello, 548 F.2d 20 (1st Cir. 1977). _____________ ____________ At the close of all the evidence, Ciocca renewed his objection to "all the evidence that relates to the conspirator hearsay." Trial Transcript, vol. 2, at 378. The following colloquy ensued: THE COURT: Let me see. You say strike all the evidence. What evidence particularly do you wish to have stricken? MR. McBRIDE: Any statements made by Nelson on the one hand that were intercepted on a consensual monitoring device between Caporino and Nelson, and any statement that existed between Caporino and the defendant who [sic] in any way reflected a continuing-- -12- THE COURT: The defendant's statement intercepted by the wire would be an admission to [sic] the party. MR. McBRIDE: I'm sorry, you are absolutely correct, I'm wrong. Id. at 378-79. ___ On appeal, Ciocca argues that "certain tapes of conversations were played for the jury. Defense counsel had a standing objection to the admission of the conversations as hearsay. The Court overruled the objection, allowing the tapes to come in under the co-conspirator statement exception to the hearsay rule as provided under Federal Rule of Evidence 801(d) (2) (E). The Court erred because there was insufficient evidence of a criminal conspiracy between the defendant and Caporino." Appellant's Brief at 19. We first note that Ciocca has not appealed the district court's admission of the tape recordings of conversations between Caporino and Ciocca's co-conspirator, Nelson. Because Ciocca has failed to appeal that ruling, the admissibility of those recordings is not before us. We next find that Ciocca has waived the argument that the taped conversations between Caporino and him were inadmissible. "A party waives a right when it makes an intentional relinquishment or abandonment of it." United States _____________ v. Mitchell, 85 F.3d 800, 807 (1st Cir. 1996) (internal ________ quotations omitted). Forfeiture, of course, is different, in that it occurs only "if a defendant merely fails to make a timely assertion of that right." Id. "The distinction is a key one, ___ for '[m]ere forfeiture, as opposed to waiver, does not extinguish -13- an "error" under Rule 52(b). . . .' In short, where there was a forfeiture, we apply a plain error analysis; where there was waiver, we do not." Id. (quoting United States v. Olano, 507 ___ _____________ _____ U.S. 725, 733-37 (1993)). Thus, Ciocca's acknowledgment at the Petrozziello hearing of the correctness of the district court's ____________ ruling with regard to the taped conversations between Ciocca and Caporino constitutes waiver, which extinguishes any error on appeal. United States v. Olano, 507 U.S. 725, 733 (1993). Our _____________ _____ analysis ends here.2  ____________________ 2 We point out that defense counsel's agreement with the district court's ruling on these conversations was in fact warranted and correct as a matter of law. Ciocca's statements in these conversations constitute admissions against interest and were properly admissible pursuant to Federal Rules of Evidence 801(d)(2)(A) and 804(b)(3). Additionally, the statements by Caporino, in response, were properly admissible because a "defendant, having made admissions, [cannot] keep from the jury other segments of the discussion reasonably required to place those admissions in context. In this instance, the other parts of the conversation were properly admitted as 'reciprocal and integrated utterances,' . . . to put [Ciocca's] statements into perspective and make them 'intelligible to the jury and recognizable as admissions.'" United States v. McDowell, 918 F.2d 1004, 1007 (1st Cir. 1990) ______________ ________ (citations omitted). Moreover, while some of Ciocca's statements made in the course of the conversations may not have been admissions against interest, his failure to object to such statements below forfeits any argument he may have for the inadmissibility of non-admission statements. Forfeiture of this argument triggers plain error review. Mitchell, 85 F.3d at 807. Ciocca's brief does not even ________ indicate which statements may give rise to a plain error finding. Thus, Ciocca has not carried his burden of showing plain error, see United States v. Winter, 70 F.3d 655 (1st Cir. 1995) ___ _____________ ______ (appellant bears the burden of establishing plain error), cert. _____ denied, ___ U.S. ___, 116 S. Ct. 1366 (1996), and we find no such ______ -14- CONCLUSION CONCLUSION Based on the foregoing considerations, we affirm the affirm district court's rulings. So ordered. __________  ____________________ error here. -15-