# United States Court of Appeals
## For the First Circuit

No. 98-2108

UNITED STATES,

Appellee,

v.

WALDEMAR GONZALEZ-VAZQUEZ,

Defendant, Appellant.

No. 98-2109

UNITED STATES,

Appellee,

v.

HECTOR HERNANDEZ-NEGRON,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Héctor M. Laffitte, U.S. District Judge]

Before

Selya, Circuit Judge,
Coffin, Senior Circuit Judge,
and Lipez, Circuit Judge.

———————

Lydia Lizarribar-Masini for appellant González-Vázquez.
Mauricio Hernández Arroyo for appellant Hernández-Negrón.
Antonio A. Bazán, Assistant United States Attorney, with whom Guillermo Gil, United States Attorney, Jorge E. Vega-Pacheco, Assistant United States Attorney, Chief, Criminal Division, and Camille Vélez-Rivé, Assistant United States Attorney, were on brief, for the United States.

———————

July 18, 2000

———————

**LIPEZ, Circuit Judge**.  Hector Hernández-Negrón and Waldemar González-Vázquez appeal from their convictions following a trial for conspiracy to distribute controlled substances and aiding and abetting the distribution of controlled substances within one thousand feet of a school. Hernández claims that he received ineffective assistance of counsel when his trial attorney failed to accept a plea bargain as instructed, and that the government then violated his constitutional rights by withdrawing the original plea offer and offering a new "package deal" plea bargain that Hernández could only accept if his two remaining co-defendants also pled guilty. Hernández also argues that the district court misapplied U.S.S.G. § 3B1.1 in finding him to be a "manager or supervisor" of the criminal activity.  González challenges the sufficiency of the evidence, arguing that it was based solely on testimony from the government's confidential informant.  We reject these arguments (as well as several arguments concerning evidentiary errors) and affirm the convictions and sentence of Hernández and the convictions of González.

## I. Background

We recite the facts in the light most favorable to the jury's verdict, consistent with record support.  See United States v. Hughes, 211 F.3d 676, 679 (1st Cir. 2000).  In January

-3-

1995, FBI Agent Michael Anderson learned that an individual named Angel González-Ortiz, a.k.a. "Pichi," headed a gang that distributed illegal drugs at the Luis Palés Matos housing project in Guayama, Puerto Rico. The distribution point was within 1000 feet of the Palés Matos Public School. Anderson opened an investigation, assisted by Agent José Tirado, a Puerto Rico Police officer who had performed some initial investigation of the drug ring. Anderson met with a confidential informant ("CI"), Ramonita Massó-Nieves, who had assisted Agent Tirado in his initial investigation. To corroborate the information provided by Massó, Anderson set up two video surveillance cameras at the drug point, recording numerous drug deals.

In February 1996 a Grand Jury returned a two-count indictment against twenty-two individuals, charging a conspiracy to distribute controlled substances in violation of 21 U.S.C §§ 841(a)(1) & 846 and aiding and abetting the distribution of controlled substances within 1,000 feet of a school in violation of 21 U.S.C. §§ 841(a)(1) & 860 and 18 U.S.C. § 2. Shortly after the indictments, the government offered plea bargains to all of the co-defendants. Nineteen of the twenty-two co-defendants accepted a plea bargain; Hernández, González, and Louis Bonano-Serrano went to trial.

The jury trial lasted seven days. Through surveillance videotapes, the jury saw drug transactions involving many of the individuals who had pled guilty. Hernández, González, and Bonano, however, did not appear in these videos. The government attempted to link the defendants to the conspiracy through the testimony of Massó and Agent Tirado. Massó testified that, from her experience working at the drug point, she knew that Hernández, González, and Bonano were the "guilterro" or "triggermen" for Pichi, insuring that the kingpin and his interests were protected. She further testified that González had provided drugs to the distribution point and that Hernández was second in command, after Pichi himself. She also testified that on one occasion Hernández had used her apartment to package drugs, and that she called Agent Tirado to inform him. Agent Tirado confirmed this, testifying that upon arriving at Massó's apartment, he found Hernández and two others sitting around a table packaging a powder that a field test indicated was cocaine. A chemist testified that later laboratory tests also indicated that the substance was cocaine. Tirado also testified that when he stopped González for a traffic violation he found a bag containing drug packaging paraphernalia.

González and Bonano did not offer defense witnesses. Hernández offered one witness: a co-conspirator who had pled

guilty, and who testified that Hernández had been with him when Agent Tirado came to Massó's apartment and found them packaging drugs. The jury found Hernández and González guilty on both counts. Bonano was acquitted. Hernández was sentenced to 450 months and González was sentenced to 360 months.

We evaluate Hernández's claims first, turn then to the issues raised by González, and finally address an issue raised by both appellants.

## II. Hernández

### A. The Plea Bargain

Hernández raises two arguments related to his unsuccessful efforts to obtain a plea agreement from the government. Like all of the twenty-two original co-defendants, Hernández was offered a plea agreement after he was indicted in 1996. Nineteen of the co-defendants accepted the plea bargain and were sentenced to between eighteen and forty-six months. Hernández, however, deferred a decision on the plea offer while preparing a motion to dismiss. After that motion was denied, Hernández moved to compel the government to honor the initial plea agreement. The government responded that there had been no agreement. Rather, there had only been an offer that Hernández had not accepted and that was now withdrawn. The government further stated that it had advised Hernández that "trial

-6-

preparation in this case would be the same against one or against any of the three co-defendants."

1. Ineffective Assistance of Counsel

Hernández argues that he received ineffective assistance of counsel because his trial counsel mishandled the plea bargaining process by grossly underestimating Hernández's potential sentence if the case were taken to trial, having stated that Hernández could face a maximum of a ten year prison term when in reality he faced a life sentence (and in fact received thirty-seven and a half years). Additionally, Hernández asserts that his trial counsel failed to accept the plea offer as instructed, allowing the offer to lapse. Hernández asserts that he went so far as to call his sisters in the United States to enlist their help in bypassing his attorney and communicating to the government that he wanted to accept the plea bargain.

If true, Hernández's claims would present a serious ineffective assistance question. See Boria v. Keane, 99 F.3d 492, 496 (1st Cir. 1996) ("A defense lawyer in a criminal case has the duty to advise his client fully on whether a particular plea to a charge appears to be desirable."); id. at 496-97 ("The decision whether to plead guilty or contest a criminal charge . . . must ultimately be left to the client's wishes."). However,

"[w]e have held with a regularity bordering on the monotonous that fact-specific claims of ineffective assistance cannot make their debut on direct review of criminal convictions, but, rather, must originally be presented to, and acted upon by, the trial court." United States v. Berríos, 132 F.3d 834, 841 (1st Cir. 1998) (quoting United States v. Mala, 7 F.3d 1058, 1062-63 (1st Cir. 1993)); see also United States v. McGill, 952 F.2d 16, 19 (1st Cir. 1991); United States v. Hunnewell, 891 F.2d 955, 956 (1st Cir. 1989); United States v. Costa, 890 F.2d 480, 482-83 (1st Cir. 1989).

While there is an exception to this bar in cases "where the critical facts are not genuinely in dispute and the record is sufficiently developed to allow reasoned consideration of the ineffective assistance claim," United States v. Soldevila-López, 17 F.3d 480, 485 (1st Cir. 1994), Hernández's claims require the resolution of factual disputes. We thus follow our usual practice of dismissing this portion of the appeal without prejudice to Hernández raising the ineffective assistance claim in a 28 U.S.C. § 2255 petition. See id.

We note, though, that this seems to be one of the "rare section 2255 cases in which the appointment of counsel [would be] warranted." Mala, 7 F.3d at 1064. As in Mala, the allegation of ineffectiveness is serious and the record provides

-8-

some support for the defendant's claim.  Under the initial plea agreement that Hernández's trial counsel allegedly refused to accept, Hernández would have likely received forty-six months, given a reduction for acceptance of responsibility and the government's willingness to drop the aiding and abetting count and stipulate that Hernández was only responsible for a fraction of the drugs.  Both at the sentencing hearing and in an affidavit filed on appeal, Hernández stated that he had instructed his trial attorney to accept the plea bargain because it was much less severe than the twenty years he was serving on Puerto Rico charges relating to his involvement in the conspiracy.[1]  After trial, Hernández received a sentence of thirty-seven and half years--almost ten times the sentence he would have likely received pursuant to the proposed plea agreement.  Moreover, the court ruled that the federal sentence could not be served concurrently with the related twenty year Puerto Rico sentence because the local courts were "too lenient."  We therefore "direct the district court, if appellant petitions for section 2255 relief and demonstrates continued

---

[1] Three of Hernández's relatives have also filed affidavits stating that Hernández telephoned two of his sisters (who lived in Ohio) to enlist their help in bypassing his attorney and telling the government directly that he wanted to accept the offer.

financial eligibility, to appoint counsel for him under 18 U.S.C. § 3006A(a)(2)(B)." Id.

   2.  The "Package Deal" Objection

Hernández argues that the government violated his constitutional rights by withdrawing the original plea offer and replacing it with a "package deal" plea that Hernández could only accept if his two remaining co-defendants also pled guilty. Because his co-defendants wanted a jury trial, Hernández says he was unable to accept the agreement and was thus "forced" to go to trial.

Hernández's objections have no merit. First, the government was under no obligation to leave its original plea offer open. At the sentencing hearing, Hernández's counsel conceded that he had never accepted the initial plea offer, instead hoping for success on a motion to dismiss. He further conceded that "while we were waiting for disposition of those motions . . . at that point, between all that, the government withdrew." It is axiomatic that a prosecutor may withdraw a plea offer before a defendant accepts it. See United States v. Papaleo, 853 F.2d 16, 19-20 (1st Cir. 1988); see also Mabry v. Johnson, 467 U.S. 504, 507 (1984).

Given that the government was entitled to withdraw the initial plea offer, the question becomes whether the government

-10-

could offer a new "package deal" plea bargain that would be available to Hernández only if his two co-defendants also gave up their right to a jury trial. Assuming that a "package deal" offer was made[2], it would not violate Hernández's constitutional rights. Although we have expressed concerns with package deal plea agreements, those concerns have no application here. The difficulty with "package deal" plea offers is not the fear that a defendant, like Hernández, will be "forced" to go to trial. Rather, it is the opposite fear that the defendant will involuntarily waive his right to a jury trial because his codefendants will coerce him to accept the plea agreement. See United States v. Martínez-Molina, 64 F.3d 719, 732 (1st Cir. 1995). We have held that "[p]ackage plea deals therefore impose special obligations: the prosecutor must alert the district court to the fact that codefendants are entering a package deal, and the district court must carefully ascertain the

---

[2]While the record is not entirely clear, it suggests that the government did offer Hernández a "package deal." In response to Hernández's motion to compel the government to accept its original plea offer, the government stated that "[Hernández's] [c]ounsel was advised in no uncertain terms that . . . trial preparation in this case would be the same against one or against any of the three co-defendants." Moreover, when Hernández informed the trial court that the government had offered a "package deal" arrangement, the trial court seems to have accepted this characterization in deciding that such an arrangement was unproblematic, and the government did nothing to challenge this characterization.

voluntariness of each defendant's plea." <u>Id.</u> at 733 (internal citations omitted) (vacating package deal guilty plea when district court did not determine if it was voluntary); <u>see also</u> <u>United States</u> v. <u>Daniels</u>, 821 F.2d 76, 78-79 (1st Cir. 1987) (vacating package deal guilty plea when government did not inform trial court about nature of agreement).

The "voluntariness" concern that the defendant may have been coerced into giving up his right to go to trial obviously does not apply when the defendant <u>does</u> go to trial. It is difficult, then, to understand the constitutional right at stake here. While the "package deal" did limit Hernández's ability to obtain a plea bargain (since the other defendants would also be required to plead guilty), the fact remains that "there is no constitutional right to plea bargain; the prosecutor need not do so if he prefers to go to trial. It is a novel argument that constitutional rights are infringed by trying the defendant rather than accepting his plea of guilty." <u>Weatherford</u> v. <u>Bursey</u>, 429 U.S. 545, 561 (1977); <u>see also</u> <u>United States</u> v. <u>Wheat</u>, 813 F.2d 1399, 1405 (9th Cir. 1987) (rejecting defendant's claim that package deal plea was unconstitutional because it "forced" him to go to trial).

**B. Upward Adjustment for Supervisor / Manager Role**

Section 3B1.1(b) of the United States Sentencing Guidelines calls for a three point increase to the base offense level "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive."  U.S.S.G. § 3B1.1(b); see also United States v. Joyce, 70 F.3d 679, 682 (1st Cir. 1995).  Hernández claims that the district court erred in ordering a two level upward adjustment pursuant to §3B1.1(b) because he was not a "manager or supervisor."  Since the determination of whether a defendant played this aggravated role is fact intensive, we will reverse a trial court's determination only if it is clearly erroneous.  See United States v. Shrader, 56 F.3d 288, 293 (1st Cir. 1995); United States v. Morillo, 8 F.3d 864, 871 (1st Cir. 1993).

As the district court noted at the sentencing hearing, Massó testified that Hernández was second in command at the drug point.  Moreover, Hernández played a leadership role in arranging with Massó to use her apartment for drug packaging. Thus, there was sufficient evidence for the district court to conclude that the "defendant, in committing the crime, exercised control over, or was otherwise responsible for overseeing the activities of, at least one other person." United States v. Cali, 87 F.3d 571, 578 (1st Cir. 1996)(quoting United States v.

-13-

<u>Savoie</u>, 985 F.2d 612, 616 (1st Cir. 1993)). As such, the imposition of supervisory liability under § 3B1.1(b) was not clearly erroneous.

There is one other issue related to the § 3B1.1(b) determination. Although the court found that § 3B1.1(b) applied, it decided to "give [Hernández] a break on this one" and increase the offense by only two levels rather than the three called for by the guideline. This was error. As we noted in <u>United States</u> v. <u>Rostoff</u>, 53 F.3d 398, 412-14 (1st Cir. 1995), § 3 B1.1 sets forth a precise adjustment scheme[3] that cannot be modified by the district court. The Sentencing Commission did not provide for a partial upward adjustment under § 3B1.1, in contrast to other provisions where the Commission authorized the sentencing judge to select an intermediate adjustment. <u>See</u>, <u>e.g.</u>, U.S.S.G. § 2A2.2(b)(3)(D), (E) (intermediate adjustment allowed for injuries considered to be "between" specified categories of injuries); § 3B1.2 (intermediate adjustment allowed for mitigating role "falling

_____

[3]If a crime involves "five or more participants or was otherwise extensive," the Guidelines provide for a four level enhancement for an "organizer or leader," U.S.S.G. § 3B1.1(a), and three levels for a "manager or supervisor," U.S.S.G § 3B1.1(b). For criminal activity on a smaller scale, the Guidelines provide for a two level upward adjustment for all four roles--organizers, leaders, managers or supervisors. <u>See</u> U.S.S.G. § 3B1.1(c).

-14-

between" minimal and minor participation).  Therefore, a court may not "forgo the three-level increase called for by U.S.S.G. § 3B1.1(b) and instead impose a two-level increase" when it finds mitigating circumstances.  United States v. Cotto, 979 F.2d 921, 922 (2d Cir. 1992); see also United States v. Kirkeby, 11 F.3d 777, 778-79 (8th Cir. 1993) ("A trial court's only options in cases involving a criminal activity with five or more participants are, therefore, a four-level enhancement under § 3B1.1(a), a three-level enhancement under § 3B1.1(b), or no enhancement at all . . . .").

Although the district court erred in adjusting Hernández's offense by two levels rather than three, the government did not cross-appeal.  We therefore deem the issue waived and affirm the sentence.  See generally United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

## C. Limits on Hernández's Cross-Examination of Tirado

Hernández objects that the district court improperly limited his cross-examination of José Tirado, a Puerto Rico Police officer working (at the time of the conspiracy) for the Drugs and Narcotics Division in the Guayama area.  Agent Tirado testified that acting on a tip from Massó, he obtained a warrant and entered her apartment with Guayama officers Laboy Rólon and Juan Rodríguez.  Tirado stated that he found Hernández and two

of his co-conspirators packaging a white powder, which field tests indicated was cocaine.  The drugs were seized and stored in Rodriguez's locker.

Hernández wanted to cross-examine Tirado about allegations that Rodríguez and other Guayama area officers were corrupt.  The district court ruled that while questions on the chain of custody of the drugs would be allowed, "you cannot benefit from somebody else's corruption, and it is immaterial to this case."  The court reasoned that the corruption was "immaterial" because Tirado himself had never been accused of corruption and because the corruption of other officers at the local level did not implicate the federal prosecution.

The Confrontation Clause of the Sixth Amendment secures a right to cross-examination in order to test "the believability of a witness and the truth of his testimony." United States v. Carty, 993 F.2d 1005, 1009 (1st Cir. 1993).  The right to cross-examine, however, is not unlimited.  When a witness's credibility is at issue, the trial court may limit cross-examination as long as the court allows "sufficient leeway to establish a reasonably complete picture of the witness' veracity, bias, and motivation."  United States v. Laboy-Delgado, 84 F.3d 22, 28 (1st Cir. 1996) (internal quotation marks omitted).  "Confrontation clause challenges are

-16-

reviewed <u>de</u> <u>novo</u> to determine whether defense counsel was afforded a reasonable opportunity to impeach adverse witnesses; once that threshold is reached, the trial court's restrictions on the extent and manner of cross-examination are reviewed only for abuse of discretion." <u>United States</u> v. <u>Balsam</u>, 203 F.3d 72, 87 (1st Cir. 2000) (citing <u>United States</u> v. <u>Gomes</u>, 177 F.3d 76, 80 (1st Cir. 1999)).

The district court's unwillingness to allow Hernández to question Tirado about the corruption of other police officers did not prevent the jury from obtaining "a reasonably complete picture of the <u>witness'</u> veracity, bias, and motivation." <u>Laboy-Delgado</u>, 84 F.3d at 28 (emphasis added). While a magistrate judge's pre-trial report adopted by the district court contained evidence that some police officers (including Rodríguez) had behaved corruptly in other drug cases, there was no allegation that Tirado was himself corrupt. Indeed, Tirado provided the United States with information that helped implicate other corrupt officers. Thus, any testimony tending to show that these other officers were dishonest would not implicate Tirado's veracity, bias, and motivation. More concretely, cross-examination that attacked Rodríguez's integrity would do nothing to cast doubt on Tirado's claims that (1) he personally saw Hernández packaging a white powder, (2) he

-17-

personally observed a field test indicating that the white powder was cocaine, and (3) he recognized the drugs from the laboratory as those seized from Hernández.

Moreover, the district court did not completely bar Hernández from questioning Tirado about Rodríguez. Rather, the court allowed extensive questioning as to how Rodríguez handled the evidence in this case, including the unusually lengthy storage in Rodríguez's locker and the miscounting of the bags of drugs. The district court "retains wide latitude to impose reasonable limits" on cross-examination in order to avoid confusion of the issues or extended discussion of marginally relevant material. United States v. Twomey, 806 F.2d 1136, 1139 (1st Cir. 1986). Since Hernández was unable to offer any evidence that Rodríguez corruptly handled the case against Hernández, it was not unreasonable for the court to limit Hernández to questioning Tirado about these concrete factors relating to storage and quantification rather than allowing a broad inquiry into the corruption of third party police officers who were not appearing as witnesses.

### III. González

### A. Sufficiency of Evidence

González was convicted of conspiracy to distribute controlled substances, 21 U.S.C. §§ 841(a)(1) & 846, and of

aiding and abetting the distribution of controlled substances within one thousand feet of a school, 21 U.S.C. §§ 841(a)(1) & 860 and 18 U.S.C. § 2.  The evidence tying him to the drug operation came primarily from Massó, a paid government informant.  González does not argue that the evidence, taken as a whole, was insufficient.  Rather, González claims that "[t]he evidence, excluding Ramonita Massó, is legally insufficient to support appellant's conviction." (emphasis added).  We reject González's sufficiency challenge.  His premise that Massó's testimony must be disregarded as "not trustworthy" because of her informant status is unsupportable.

It is well-established that "the testimony of interested informants is not so inherently unreliable that it must be excluded."  United States v. Cresta, 825 F.2d 538, 546 (1st Cir. 1987).  A conviction may be based solely on the uncorroborated testimony of a confidential informant "so long as the testimony is not incredible or insubstantial on its face." United States v. Ciocca, 106 F.3d 1079, 1084 (1st Cir. 1997) (quoting United States v. Andújar, 49 F.3d 16, 21 (1st Cir. 1995)). While the credibility of an interested informant can be challenged, the challenge should ordinarily be directed to the jury, not the appellate court.  Thus, when an informant is paid a contingent fee, "the jury must be informed of the exact nature

-19-

of the contingency agreement; the defense counsel must be permitted to cross-examine the witness about the agreement; and the jury must be specifically instructed to weigh the witness' testimony with care." Cresta, 825 F.2d at 546; see also United States v. Fernández, 145 F.3d 59, 62 (1st Cir. 1998) (plain error review when defendant does not request the "special care" instruction). When these "established safeguards," id., are met, we will not disturb a conviction based on the testimony of an interested informant.

Massó's testimony was certainly not "incredible or insubstantial on its face." Ciocca, 106 F.3d at 1084. She provided detailed descriptions of González's participation in the drug distribution operation. González was allowed to--and did--vigorously cross-examine Massó, suggesting that her testimony was untruthful. Massó admitted that she had started working at the drug point before she made a decision to serve as an informant. González also brought out inconsistencies between Massó's trial testimony--where she identified González as a "triggerman" and recalled an incident when he delivered drugs to the distribution point--and her investigative interviews with Agent Tirado and Agent Anderson. During the closing, González argued that Massó was now lying about González's role due to compensation she had acknowledged on direct: $10,000 for

expenses, $10,000 for her availability, and the promise of a "bonus" upon completion of the trial, regardless of its result. Finally, the trial court instructed the jury to weigh Massó's testimony with care.[4] Despite this admonition, the jury rejected González's defense that Massó was lying and voted to convict. We have no reason to disturb the verdict on sufficiency grounds.

**B. The Traffic Stop**

González argues that the district court erred in failing to strike Agent Tirado's testimony that he saw González with drug paraphernalia as he left the distribution point. Tirado testified that on March 4, 1994, he stopped González for traffic violations as he left the housing project on his motorcycle. A consensual search of González's sports bag revealed a scale, a sieve, plastic containers, and pieces of aluminum--items Tirado recognized as frequently used to process

---

[4]In addition to receiving a general instruction on witness credibility, the jury was advised that it should consider whether Massó's pre-trial statements were consistent with her testimony at trial and that the testimony of "an informer for pay" must "always be examined and weighed with greater care and caution than the testimony of an ordinary witness." We assume for the sake of argument that González properly requested these instructions, though the record is unclear. See Fernández, 145 F.3d at 62 (plain error review if "special care" instructions not requested).

controlled substances.  When Tirado told the other officers, "Look what this guy has in here," González began to run.

After cross-examination of Agent Tirado was complete, González moved to strike the testimony concerning the traffic stop on the grounds that the evidence was irrelevant to the conspiracy charges and, even if relevant, unduly prejudicial under Fed. R. Evid. 403.  The trial court denied the motion to strike, stating, inter alia, that the evidence was relevant (and more probative than prejudicial) because "he was at the drug point within the time frame of the conspiracy and carrying paraphernalia is consistent with drug trafficking."  We review evidentiary rulings for abuse of discretion.  United States v. Rodríguez, 162 F.3d 135, 142 (1st Cir. 1998).

The evidence was plainly admissible as relevant evidence of the conspiracy: combined with the testimony of Massó, it suggested that González was a member of the drug ring at the housing project.  Likewise, "it is only unfair prejudice, not prejudice per se, against which Rule 403 guards."  United States v. Rivera-Gómez, 67 F.3d 993, 997 (1st Cir. 1995). "Unfairly prejudicial evidence is evidence having some quality that moves the jury to attribute to it excessive probative value. It is evidence that 'triggers [the] mainsprings of human action [in such a way as to] cause a jury to base its decision

-22-

on something other than the established proposition in the case.'" <u>United States</u> v. <u>Currier</u>, 836 F.2d 11, 18 (1st Cir. 1987) (quoting 1 Weinstein's Evidence § 403[03], 36-39 (1986)). The items González was carrying did not create a danger of such unfair prejudice. Rather, a reasonable jury could consider the testimony concerning these items as circumstantial evidence of González's involvement in the conspiracy.

## IV. Hernández and González

Hernández and González argue that the district court erred in admitting the testimony of Puerto Rico Police Officer Gregorio Durán regarding investigations and surveillance at the Luis Palés Matos housing project. Durán testified that while investigating drug distribution at the housing project he observed Hernández, González, and Bonano acting as Pichi's bodyguards. Cross-examination, however, revealed that Durán was unsure precisely when he saw the co-defendants. Since some of Durán's observations were made before the charged conspiracy, he could not be certain that he had seen the defendants within the time frame of the conspiracy. Surveillance reports that could have been used to clarify when Durán saw the defendants, or to impeach his testimony if the defendants were not mentioned in them, could not be obtained because they were stored in a Puerto Rico facility that OSHA had declared highly contaminated.

-23-

In response, Hernández and González requested a mistrial. Although arguing that no mistrial was necessary, the government suggested to the district court that it might strike Agent Durán's testimony and issue a curative instruction. The trial court reasoned that there was no basis for a mistrial--or even for striking the testimony--because 1) the reports were unavailable to the government, 2) there had been no misconduct, and 3) the defendants "have had the chance to cross-examine this witness and really attack his credibility on the grounds that he did not observe the matters within the time frame." Nonetheless, the court agreed to strike the testimony and issue the cautionary instruction because "the Government wants to do that." On appeal, González and Hernández claim that Agent Durán's testimony impermissibly bolstered Massó's testimony. Given that Durán's testimony was struck, the only possible legal argument is that the remedy of striking the testimony and issuing a cautionary instruction was insufficient to cure the harms caused by the allegedly inadmissible testimony and that the mistrial the defendants sought should have been granted.

We find no error in the trial court's denial of a mistrial, much less the manifest abuse of discretion required for reversal. See United States v. Rullán-Rivera, 60 F.3d 16, 18 (1st Cir. 1995) ("Mistrial is a last resort, to be employed

only if the demonstrated harm can be cured by no less drastic means, such as a contemporaneous jury instruction."). Even assuming that Agent Durán's testimony was inadmissible (an assumption we make solely for the sake of argument), the district court's response--striking the testimony and issuing a curative instruction--was certainly adequate. The court told the jury:

> Now, the testimony of Agent Gregorio Durán Malavé concerning his observations that he saw the three defendants providing security service, body guarding 'Pichi', well I am ordering that testimony to be stricken from the record, and I am instructing you to erase it from your mind entirely, the way I told you, the way you swore to obey my instructions and follow the law. So again, I repeat, disregard that testimony , that portion of the testimony, that portion, entirely from your minds.

We presume that juries follow instructions. See United States v. Woodward, 149 F.3d 46, 73 (1st Cir. 1998). While this presumption may be rebutted "on a sufficient showing that the offending testimony reasonably could not have been ignored and that serious prejudice likely resulted," Rullán-Rivera, 60 F.3d at 18, no such showing has been made here. Indeed, Agent Durán's stricken testimony also implicated co-defendant Bonano as a bodyguard for Pichi. The jury, however, acquitted Bonano,

indicating that they were not unduly influenced by the testimony.

## V. Conclusion

For the reasons stated herein, we **affirm** the convictions and sentences.