[NOT FOR PUBLICATION--NOT TO BE CITED AS PRECEDENT]

# United States Court of Appeals
## For the First Circuit

No. 01-1819

UNITED STATES,

Appellee,

v.

TODD J. LASCOLA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary M. Lisi, U.S. District Judge]

Before

Boudin, Chief Judge,
Torruella and Howard, Circuit Judges.

Todd J. Lascola on brief pro se.
Margaret E. Curran, United States Attorney, Donald C. Lockhart, Assistant United States Attorney, and Ira Belkin, Assistant United States Attorney, on brief for appellee.

September 3, 2002

**Per Curiam**.  Todd J. LaScola, a licensed stockbroker, pled guilty to nine counts of a 55 count indictment, alleging mail fraud, 18 U.S.C. §1341, wire fraud, 18 U.S.C. § 1343, and embezzlement, 18 U.S.C. § 664.  His crimes comprised several schemes involving two companies in which he was engaged, CPA Advisors Network ("CPA") and CPI Investment Management, Inc. ("CPI").  LaScola was sentenced to 96 months imprisonment, three years supervised release, and restitution of approximately $8.1 million dollars.  He challenges several of the sentencing guideline calculations.  We affirm.

As an initial matter, LaScola makes an Apprendi type argument, see Apprendi v. New Jersey, 530 U.S. 466 (2000), asserting that none of the upward adjustments (apart from minimal planning) was authorized because none was specifically mentioned in the indictment or in the plea agreement.  This argument was not raised in the district court and, thus, is subject to the plain error standard.  There was no error, let alone plain error.  Apprendi does not apply to guideline findings that increase the sentence but do not elevate it beyond the statutory maximum.  United States v. Caba, 241 F.3d 98, 101 (1st Cir. 2001).  The statutory maximum for each count of conviction was five years.  LaScola received a 60 month term of imprisonment on Count 1 (mail fraud) and concurrent 36 months imprisonment on the remaining eight counts to be served consecutive to the 60 month term imposed on Count 1 (for a total term of 96 months).

-2-

§2F1.1(b)(1) - Amount of loss[1]

The Presentence Report ("PSR") calculated that the total loss amount generated by LaScola's criminal conduct was between $5 and $10 million dollars and thus proposed a 14 level increase in the base offense level. See §2F1.1(b)(1)(O). In the district court, LaScola argued that the appropriate amount of loss was between $2.5 and $5 million dollars, reflecting a 13, rather than 14, level increase. See §2F.1.1(b)(1)(N). LaScola argued that he did not pocket the $6 million obtained from the CPA clients to "purchase" the RBG Notes from Local 99's Plan and that he did not intend the loss to the CPA clients. Rather, he hoped that the RBG Notes would mature and argued that, in fact, there was still some value to these Notes. He analogized to fraudulent loan cases and suggested that, just as the value of the assets pledged to secure a fraudulent loan reduces the amount of loss in a fraudulent loan

---

[1]We refer to the November 2000 Sentencing Guidelines. LaScola did not object to the use of this version in the district court. On appeal, he refers to the November 1998 version of the Guidelines, contending that "[e]xcept for clarifications, the Guidelines in effect as of the last date of criminal activity, in this case 1998 Guidelines, are to be used." Reply brief at p.15, n.1. In fact, however, "[b]arring any *ex post facto* problem, a defendant is to be punished according to the guidelines in effect at the time of sentencing." United States v. Harotunian, 920 F.2d 1040, 1041-42 (1st Cir. 1990). In any event, for purposes of this case, there is no dispositive distinction between the 1998 and 2000 versions.

We note that, effective November 2001, the Sentencing Commission deleted the separate fraud guideline (§2F.1), consolidating it with the theft guideline (§2B1.1), and resulting in a completely rewritten §2B1.1. We use the former designations of §2F1.1.

case, so too the "value" of the RBG Notes should reduce the amount of loss attributed to his conduct. The court rejected that assessment, instead calculating the loss as the amount of money that LaScola improperly transferred from the various accounts -- well in excess of $5 million -- and concluding that LaScola's purported expectation that the Notes would mature was irrelevant.

"We review the district court's interpretation of the loss provisions of the Guidelines de novo and review its factual findings only for clear error." United States v. Blastos, 258 F.3d 25, 30 (1st Cir. 2001). On appeal, LaScola contends that, although he was convicted of fraud, the court erroneously treated his conduct as a theft to determine the amount of loss. There was no error. The commentary to the fraud guideline itself provides for such cross-reference. See U.S.S.G. §2F1.1, comment. (n.8). Further, LaScola continues to assert that his case is analogous to a fraudulent loan case and thus he should be credited with the "value" of the RBG Notes to offset any loss to his victims. Amazingly, although LaScola conceded in the district court that the loss was $2.5 and $5 million, he now contends on appeal that the net loss to the victims was $0.[2] "The Guidelines recognize loan fraud as a specific exception to the usual methods of calculating loss set

[2]He relies on purported property appraisals of the real estate developments supported by the RBG Notes, the worthiness of which is unknown, and, more importantly, are not properly before this court as they are not part of the district court record.

-4-

forth in §§2F1.1 and 2B1.1." United States v. Stein, 233 F.3d 6, 18 n.8 (1st Cir. 2000), cert. denied, 532 U.S. 943 (2001). LaScola's attempt to mark his scheme as analogous to loan fraud is a grievous misfit. There was no error in the district court's rejection of the attempt.

§2F1.1(b)(6)(C) - Sophisticated means

In the district court, LaScola argued that there was significant overlap between the "more than minimal planning" adjustment, §2F1.1(b)(2)(A), and the "sophisticated means" adjustment, §2F1.1(b)(6)(C), such that it amounted to double counting. LaScola did not renew this contention in his initial appellate brief and the government contends that he has abandoned that argument. LaScola tardily attempts to resurrect this double counting argument in his reply brief but, as we have repeatedly stated, "a legal argument made for the first time in an appellant's reply brief comes too late and need not be addressed." United States v. Brennan, 994 F.2d 918, 922 n.7 (1st Cir. 1993).

On appeal, LaScola contends that the district court determined that the "sophisticated means" adjustment was warranted because he used a computer system to execute his crimes and argues that this was error because operation of the computer program took little skill or training. LaScola also argues that the computer software was used simply to carry out the fraud and not to conceal it and, in fact, its use insured the detection of the fraud because it would reveal the accounts

-5-

affected, by how much, and to where the missing funds had been sent.

LaScola's description of the basis of the court's ruling is deliberately myopic. The district court found the application of the "sophisticated means" adjustment was warranted not because LaScola used a computer system but because he not only stole the existing funds from CPA clients' accounts but converted those accounts to margin accounts, giving him the ability to borrow additional money in the clients' names.[3] The emphasis and impetus for the finding of "sophisticated means" was not, as LaScola portrays it, on the use of a computer system itself but on how LaScola used that system in executing the offense by accessing his clients' accounts and converting them to margin accounts enabling him to steal more than the existing funds. There was no error either in the court's factual finding or in its application of the sophisticated means adjustment. See United States v. Humber, 255 F.3d at 1308, 1311 (11th Cir. 2001) (reciting standard of review).

§2F1.1(b)(8)(A) - Failure of a financial institution

In the district court, LaScola argued against the application of this guideline on the ground that both CPI and CPA were purely sales organizations that, although may have

---

[3]LaScola contends that the district court "erred" in stating that he "took" the passwords. LaScola says that he did not take the passwords; rather, he says, he instructed an employee with the password to execute the transaction. This is a meaningless quibble.

facilitated trades, never actually executed trades nor custodied assets resulting from such trades. He argued for a distinction between an "introducing broker" which has a limited capacity to perform functions and a "clearing broker" which is the custodian of securities and can clear and settle trades in a client's accounts. According to LaScola, CPI simply managed assets and CPA simply processed transactions, relying upon Wexford (the subsidiary of Prudential Securities), Fleet Bank and other financial institutions to execute trades or custody assets and those financial institutions, argued LaScola, remained safe, sound and solvent. The district court concluded that both CPI and CPA met the guideline definition of financial institution and became insolvent as a result of LaScola's conduct. It rejected LaScola's distinction between "introducing broker" and "clearing broker" as unavailing in light of the clear language of the guideline definition. See U.S.S.G. §2F1.1, comment. (n.19).

On appeal, LaScola renews his argument but provides no persuasive authority. There was no error in the application of this guideline adjustment. See United States v. Ferrarini, 219 F.3d 145, 159 (2d Cir. 2000) (reciting standard of review), cert. denied, 532 U.S. 1037 (2001).

§3A1.1(b)(1) – Vulnerable victim

At sentencing, LaScola withdrew any objection to the application of the vulnerable victim adjustment. LaScola was personally questioned by the district court as to whether he

understood that he was waiving his right to challenge that adjustment and he replied in the affirmative and stated that he had no questions about his waiver. Sentencing Tr. of 5/22/01 at p.5. Nonetheless, LaScola, on appeal, now argues that the application of this guideline was error. This challenge is waived. See United States v. Ciocca, 106 F.3d 1079, 1085 (1st Cir. 1997) (refusing to review waived issue).

Departure

At sentencing, LaScola made an oral motion for departure, arguing that the resulting guideline sentencing range of 87 to 108 months was far in excess of the sentences imposed in other fraud cases in the districts of Rhode Island and Massachusetts. In support, he proffered information he apparently had obtained simply from the face of the court dockets, i.e., docket numbers, term of imprisonment imposed, and amount of restitution ordered. He conceded that he was unaware of whether adjustment factors, such as vulnerable victim and/or sophisticated means, were applied in these cases. The district court rejected LaScola's proffered material as insufficient to find that his case lay outside the heartland of cases and denied a downward departure.

On appeal, LaScola reiterates his downward departure argument, albeit in the guise of a "heartland argument," but, as we have repeatedly held, a district court's refusal to depart downward is not reviewable unless based on a mistake of law. See United States v. Bunnell, 280 F.3d 46, 50 (1st Cir.

-8-

2002).  There was none here. The district court recited the proper standard for finding a departure but found LaScola's proffer insufficient to support one.  Moreover, we have held "the fact that the national median for a broadly stated offense type may be above or below a particular defendant's GSR cannot be used to justify a sentencing departure."  <u>United States</u> v. <u>Martin</u>, 221 F.3d 52, 57 (1st Cir. 2000).

<u>The judgment of the district court is affirmed</u>.